HEINE v. ROTH et al.

(Third Division. Fairbanks. June 5, 1905.)

No. 172.

1. INJUNCTION—CONTINUING TRESPASS.

A continuing and vexatious trespass amounting to a nuisance, persisted in after judgment at law, may be enjoined in equity.

[Ed. Note.—For cases in point, see vol. 27, Cent. Dig. Injunction, § 101.]

2. SAME—GROUNDS—IRREPARABLE INJURY.

By irreparable injury is not meant such injury as is beyond the possibility of repair, or beyond possible compensation or damages, but that species of injury, whether great or small, that ought not to be submitted to, on the one hand, or inflicted on the other, and which, because it is so large on the one hand, or so small on the other, or is of such constant or frequent recurrence that no fair or reasonable redress can be had therefor in a court of law.

[Ed. Note.—For cases in point, see vol. 27, Cent. Dig. Injunction, §§ 14, 98.]

3. SAME.

Where a defendant continues to trespass upon the shore lands in front of plaintiff's property after judgment at law against him, the very smallness of the actual damage to plaintiff, together with the continued nuisance created by defendant's structures upon the highway, destroying plaintiff's ingress and egress, constitutes an irreparable injury, which equity alone can remedy.

[Ed. Note.—For cases in point, see vol. 27, Cent. Dig. Injunction, § 98.]

4. SAME—HOMESTEAD—TRESPASS.

The courts have jurisdiction to inquire into and protect the occupancy, possession, and property rights of a homestead entry-

man on public·lands from the injurious trespasses of another; and if upon such inquiry it appears that defendant is a mere vexatious trespasser, it is the duty of the court to issue its mandatory injunction, restraining him from further unlawful trespass.

[Ed. Note.—For cases in point, see vol. 27, Cent. Dig. Injunction, § 77.]

5. MINES AND MINERALS—HOMESTEAD—PUBLIC LANDS.

A homestead entry of public lands in Alaska, though informal, constitutes a segregation of the tract from the public domain and its reservation for sale under the homestead laws. No subsequent mineral location can be initiated thereon until the homestead entry is canceled, after notice and hearing by contest in the United States land office.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Mines and Minerals, §§ 10–12.]

6. SAME—NAVIGABLE WATERS.

Navigable streams in Alaska are public highways, and no portion of the bed or land lying between high and low water mark is subject to location under the mineral land laws.

This is an application for equitable relief to abate a nuisance created by defendant by the erection of buildings upon the shore of the Chena river, which is admitted to be a navigable stream, between high and low water marks, and in front of plaintiff's homestead. The complaint alleges and the proofs show that plaintiff was a qualified homesteader, and in the month of April, 1903, he settled upon that tract of land described in the pleadings as Garden Island, containing less than 35 acres, and lying immediately across the Chena river from the town of Fairbanks. That the land was vacant and unappropriated public land at the time of such settlement. That plaintiff erected a dwelling house at that time, and began to clear and cultivate the land, and from that day to the present has continuously and in good faith resided upon the land, and has used and occupied it for gardening and agricultural purposes, for which use it is fit and valuable. That he has raised good crops on the ground each season, and has from season to

2 A.R.—27

season extended his clearing and enlarged his crops, and that by the sale of his vegetables he has continued to improve his land and maintain his home thereon. On May 6, 1904, he prepared, signed, and filed, and caused to be recorded in the recorder's office for the Fairbanks precinct, in which such land lies, a notice containing his name, the date of the notice, and such a description of the land settled upon, by reference to some natural object or permanent monument, as was sufficient to identify the same. That thereafter and on July 5, 1904, he prepared, and on July 9th caused to be recorded, an amended notice of his entry, containing a more complete description, his name, and the date of his original settlement. He was in the actual possession of the land, and engaged in working it, when defendant entered.

Defendant answered, denying generally, and setting up two affirmative defenses; the first alleging that plaintiff's homestead was adjoining that of one Archie Burns, and within 80 rods thereof along the shore of a navigable stream, and therefore illegal and void; the second alleging that one Woodward on the 5th day of July, 1904, located a mining claim of 20 acres upon the east end of plaintiff's homestead, and embracing the tract upon which defendant's structures stand, and thereafter gave defendant license to occupy the tract with such buildings. A reply puts the matters alleged in the answer in issue.

Defendants, Roth and Woodward, entered upon that portion of the river bank in front of plaintiff's homestead, on the upstream side of the public bridge crossing the Chena river from Fairbanks to this island, on July 3, 1904, and erected thereon piles and a superstructure of lumber, and upon this placed a tent, which they occupied as a dwelling and as a real estate office. At the time when this suit was brought Roth had bought out Woodward's interest in the structures and was in sole occupation thereof. On July 5, 1904, with full knowledge of plaintiff's occupation of the land and homestead claim,

Woodward made a placer mining location of the upper end thereof, embracing the area around the public bridge. The evidence shows that upon the point of a small bar of gravel just above the bridge fine colors of gold are to be obtained by panning. The area prospected is small, and the evidence of its value is conflicting. The land in controversy is unsurveyed; it is not classified by the land department as either mineral or agricultural; it is not within any well-recognized mineral belt, but many miles therefrom, and in a wide and fertile valley, well recognized as agricultural and garden lands. The surrounding lands have no value as mineral lands, but are chiefly valuable for agricultural and town site purposes.

Condon, Hess & Brown, for plaintiff.
Carr & Nye, for defendants.

WICKERSHAM, District Judge. Objection is made by defendant that the complaint does not state facts sufficient to give the court jurisdiction to enter a decree for plaintiff. It alleges plaintiff's citizenship, his entry of Garden Island as a homestead, the making, filing, and recording of notice thereof, and that his homestead is bounded on the south and west by the Chena river, which is admitted to be a navigable stream. It alleges the subsequent entry of Roth upon the shore of the Chena river along the south boundary, between plaintiff's homestead and the river, and the erection of the structures complained of; also alleges his arrest for trespass on July 5, 1904, his conviction on July 20th, and his continued presence on the shore in these structures. The complaint then alleges, in paragraph 9:

"That by reason of the setting of said posts or piling, and of the erection of said building or tent, plaintiff's free access and passage to the navigable part of the said Chena river in front of the lands so occupied by him for a homestead was on the 3d day of May, 1904, and still is greatly straitened, obstructed, and confined, and plain-

tiff has been deprived of his right as riparian proprietor to construct landings, wharves, and docks, for his own use and for the use of those carrying on commerce on the said Chena river, to the great and irreparable injury of the plaintiff."

And the last paragraph alleges that defendant has been notified to remove his structures, but refuses to do so.

This court has heretofore (p. 257, supra) had occasion to examine into, and sustained, the right of this plaintiff to an unobstructed access from his homestead to the navigable waters of the Chena river. It is now contended, however, that equity will not interfere to aid him, because his complaint does not allege, and the proofs do not show, an irreparable injury. What is an irreparable injury?

In Gause v. Perkins, 56 N. C. 177–179, 69 Am. Dec. 728, it is said that an irreparable injury is one "of a peculiar nature, so that compensation in money cannot atone for it." This definition is fairly deducible from the earlier cases, but it is entirely too narrow to meet the decisions of more modern times. The tendency of the courts at the beginning was to grant injunctions very sparingly in cases of trespasses, but the lapse of a few years has done much to break down the barriers of this conservatism, and pave the way for the exercise of greater liberality in this direction, in the light of modern decisions. An irreparable injury may be said to be one which, either from its nature or from the circumstances surrounding the person injured, or the financial condition of the person committing the injury, cannot be readily, adequately, and completely compensated for with money. In Beach, Inj. § 35, it is said:

"Where the injury complained of is such as to destroy plaintiff's property, or to render it entirely worthless for his purposes, it may properly be regarded as irreparable."

In Kerr, Inj. §§ 16, 17, it is said:

"By the term 'irreparable injury' it is not meant that there must be no physical possibility of repairing the injury. All that is meant is that the injury would be a grievous one, or at least a material

one, and not adequately reparable by damages; and by the term 'inadequacy of the remedy by damages' was meant that the damages obtainable at law are not such a compensation as will, in effect, though not in specie, place the parties in the position in which they formerly stood." Camp v. Dixon, 38 S. E. 71, 73, 112 Ga. 872, 52 L. R. A. 755.

In a note to the case of Jerome v. Ross, 7 Johns. Ch. (N. Y.) 315, found in 11 Am. Dec. 500, it is said an injury resulting from trespass may be incapable of compensation for damage for a variety of reasons: (1) It may be destructive of the very substance of the estate. (2) It may not be capable of estimation in terms of money. (3) It may be so continuous and permanent that there is no instant of time when it can be said to be complete, so that its extent may be computed. (4) It may be vexatiously persisted in, in spite of repeated verdicts at law. (5) It may be committed by one who is wholly irresponsible, so that a verdict against him for damages would be entirely valueless. (6) It may be committed against one who is legally incapacitated from a beneficial use of the remedy at law. Deegan v. Neville, 29 South. 173, 175, 127 Ala. 471, 85 Am. St. Rep. 137. "Irreparable injury," as used in the law of injunction, does not necessarily mean "that the injury is beyond the possibility of compensation in damages, nor that it must be very great; and the fact that no actual damages can be proved, so that in an action at law the jury could award nominal damages only, often furnish the very best reason why a court of equity should interfere in a case where the nuisance is a continuous one." Newell v. Sass, 31 N. E. 176, 180, 142 Ill. 104. "By 'irreparable injury' is not meant such injury as is beyond the possibility of repair or beyond possible compensation or damages, but that species of injury, whether great or small, that ought not to be submitted to, on the one hand, or inflicted on the other, and which, because it is so large on the one hand, or so small on the other, is of such constant and frequent recurrence that no fair or reasonable redress can be had there-

for in a court of law." Farley v. Gate City Gaslight Co., 31 S. E. 198, 199, 105 Ga. 323. Other judicial definitions of "irreparable injury" and the authorities from which they are drawn may be found in "Words and Phrases Judicially Defined," vol. 4, under "Irreparable Injury."

Defendant attempts to evade the full force of these definitions by urging, first, that his solvency is not denied, and, second, that he is in possession of only part of the highway in front of plaintiff's land. Under the principle of these decisions, however, his persistent and vexatious continuance in trespass, after judgment at law adverse to his claim, the very smallness of the actual damage to plaintiff, together with the presence of these structures upon the highway in front of his property, whereby his right of ingress and egress at that point is effectually destroyed, constitutes an irreparable injury which equity alone can remedy. Then, too, if the defendant may occupy one part of the highway in front of plaintiff's land, other trespassers may occupy other parts, and the whole of plaintiff's access be cut off. His right is to access to every part of the highway, and not to that part which defendant does not choose to occupy. Counsel for defendant almost concedes that the injury complained of is irreparable and irremediable by contending that plaintiff has no remedy to abate it, either at law or in equity. It is my judgment that the complaint states sufficient ground for equitable relief by injunction, and that the allegation and proofs show a case of irreparable injury, within the well-recognized general rule, but particularly within the rule laid down by the Supreme Court of California in Shirley v. Bishop (Cal.) 8 Pac. 82; Sutter v. Heckman, 1 Alaska, 81, 188; Martin v. Heckman, 1 Alaska, 165; Works v. Junction Railroad, Fed. Cas. No. 18,046.

The power of this court to interfere by injunction is questioned by defendant's counsel, who insists that the determination of all questions relating to the character and disposition of

the public lands of the United States is vested exclusively in the general land office and the Interior Department. The courts will, however, protect the possessory right of a homesteader from the injurious trespasses of those interfering with his prior and peaceable possession acquired under the law.

"In fact, it may be stated as a well-settled proposition that the courts have the right to deal with the question of possession as between settlers upon the public domain until such time as the government, by its issuance of a patent, puts forever at rest the title to the lands. It is the duty of the court, in dealing with such matters, to exercise its equitable powers, and see to it that possession is given to the person who, under the laws of Congress, is entitled thereto; and where it is ascertained that a person claiming the right to the use and occupancy of a tract of land, the title to which is still in the United States, is, under the laws of Congress, a mere trespasser, it becomes the plain duty of the courts having jurisdiction to give to the proper party the possession of the land upon which the trespass is committed. A mere assertion of right is insufficient to deprive the rightful occupant of the quiet use of land, and, as between settlers upon the public domain, the courts should inquire into the status of the land far enough to determine whether or not a person asserting a claim of possession has a color of right to such possession under the homestead law, and if it be found that he is a mere trespasser, or that the law will not, under any fair construction, warrant his claim, it is the clear duty of the court to issue a mandatory order in injunction, restraining him from the further unlawful occupancy." Sproat v. Durland (Okl.) 35 Pac. 682; Pokegama Lum. Co. v. Klamath Lum. Co. (C. C.) 86 Fed. 528, 537; Id. (C. C.) 96 Fed. 34, 35; Marquez v. Frisbie, 101 U. S. 473, 25 L. Ed. 800; Ex parte Lennon, 166 U. S. 548, 17 Sup. Ct. 658, 41 L. Ed. 1110.

Upon the trial objection was made to the introduction of testimony in support of the Woodward mining location, under which defendant Roth seeks to justify his presence upon the ground. The question was reserved for final argument. The act of March 3, 1903, amending the homestead law as extended to Alaska, provides:

"That every person who is qualified under existing laws to make homestead entry of the public lands of the United States who has settled upon or who shall hereafter settle upon any of the public

lands of the United States situated in the District of Alaska, whether surveyed or unsurveyed, with the intention of claiming the same under the homestead laws, shall, subject to the provisions and limitations hereof, be entitled to enter three hundred and twenty acres or a less quantity of unappropriated public land in said District of Alaska." Chapter 1002, 32 Stat. 1028 [U. S. Comp. St. Supp. 1905, p. 328].

While the inception of the homestead right under this act in Alaska is informal, and accomplished by filing and recording a notice thereof in the recorder's office, the right acquired thereby is that so long recognized by the law and the decisions of the land department and the courts as a homestead entry. The effect of making such an entry is to segregate the tract of land described in the notice from the mass of the public domain, and reserve it for disposal under the homestead laws. While other subsequent claimants could file pre-emption declaratory statements upon a tract already filed upon by a pre-emptor, when once a homestead entry is allowed, no other claim of any kind could be permitted to attach to the tract until, after notice and a hearing, the homestead entry is canceled by the land office. Hastings Ry. Co. v. Whitney, 132 U. S. 357, 10 Sup. Ct. 112, 33 L. Ed. 363; Bardon v. N. P. Ry. Co., 145 U. S. 535, 540, 12 Sup. Ct. 856, 36 L. Ed. 806. This rule prevails against attempted locations under the mining laws. Hooper v. Ferguson, 2 L. D. 712; Elda Min. Co. v. Johnson, 29 L. D. 279; 1 Lindley (2d Ed.) §§ 80, 205–208. Under the principle announced by the Supreme Court of the United States in Belk v. Meagher, 104 U. S. 279, 284, 26 L. Ed. 735, the mineral location made by Woodward was void in so far as it conflicted with the prior homestead entry of Heine.

The policy of the United States in regard to the ownership and disposition of the shores of navigable streams in Alaska was declared in the act of May 14, 1898 (chapter 299), extending the homestead laws to Alaska, by section 1, as follows:

"And nothing herein contained shall be so construed as to authorize entries to be made, or title to be acquired, to the shore of

any navigable waters within said district." 30 Stat. 409 [U. S. Comp. St. 1901, p. 1412].

And by section 2 as follows:

"Provided, that nothing in this act contained shall be construed as impairing in any degree the title of any state that may hereafter be erected out of said district, or any part thereof, to tide lands and beds of any of its navigable waters, or the right of any such state to regulate the use thereof, nor the right of the United States to resume possession of such lands, it being declared that all such rights shall continue to be held by the United States in trust for the people of any state or states which may hereafter be erected out of said district. The term 'navigable waters' as herein used, shall be held to include all tidal waters up to the line of ordinary high tide and all non-tidal waters navigable in fact up to the line of ordinary high-water mark." 30 Stat. 409, § 2 [U. S. Comp. St. 1901, p. 1575].

In the matter of the application of James W. Logan to locate mining claims upon the sea beach at Nome, Secretary of the Interior Hitchcock, under date of January 3, 1900, after citing Shively v. Bowlby, 152 U. S. 1–58, 14 Sup. Ct. 548, 38 L. Ed. 331, and the statutes above quoted, said:

"In view of the foregoing, it is perfectly clear that the mining locations in question, so far as it is attempted by them to embrace lands lying below the line of ordinary high tide, are without authority of law and therefore void, and that the Land Department is without authority to grant any concessions whatever with reference to the desired occupancy or working of said tide lands for mining purposes or otherwise." 29 L. D. 395.

Congress passed a special law providing for mining on the Nome beach, but did not extend it to other shore lands in Alaska. Act June 6, 1900, c. 786, § 26, 31 Stat. 321–329.

The general rule is thus stated by Lindley:

"As to whether gravel deposits lying on the beds of water courses may be appropriated under the placer laws will depend on circumstances. If the stream is navigable, certainly no right to appropriate its bed can be sanctioned. The beds of such rivers and their banks as far as high-water mark belong to the state, and not to the federal government. * * * A mining claim located upon public lands traversed by a water course which is navigable in fact could only extend to

the edge of the stream at its high-water stage. The beds of such streams are not public lands." 1 Lindley (2 Ed.) § 428, citing, also, Argillite Ornamental Stone Co., 29 L. D. 585, and In re Fitten, 29 L. D. 451, 453. See, also, Re Nome Trans. Co., 29 L. D. 447.

The whole bed of the Chena river up to the line of high-water mark is "navigable waters"—a public highway. Even if it be conceded that the statute reserves a roadway 60 feet wide along the land side of this water highway, its effect is to widen the highway just that much. Defendant is not within the reserved 60-foot strip, but below it—on the navigable water highway. So far as Woodward's mining location lies below the line of high water of the Chena river, it is void, and affords the defendant no support. The objection to the introduction of the mining claim as evidence is sustained. This court cannot declare plaintiff's homestead entry void because located within 80 rods of another. The facts in relation thereto are peculiarly within the jurisdiction of the Land Department, since they can arise only upon the motion of the government or some contesting claimant.

Defendant's structures are upon the open navigable highway in front of plaintiff's land, and destroy his right of access from his land to the highway. He cannot maintain ejectment, nor has he any other plain, speedy, and adequate remedy at law. He has a right to the exercise of the mandatory power of this court by injunction to remove an obstruction which constitutes an irreparable injury to the full enjoyment of his right of access to his property from the highway. Ashby v. Hall, 119 U. S. 526, 7 Sup. Ct. 308, 30 L. Ed. 469. Decree for plaintiff, and mandatory injunction to compel defendant to remove his buildings from the tract in question will issue.